UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MISSOURI
EASTERN DIVISION

JOHN ROWE,                              )
                                        )
            Plaintiff,                  )
                                        )
    v.                                  )        No.  4:11CV887 TIA
                                        )
MICHAEL J. ASTRUE,                      )
COMMISSIONER OF SOCIAL SECURITY,        )
                                        )
            Defendant.                  )

## MEMORANDUM AND ORDER

This matter is before the Court under 42 U.S.C. §§ 405(g) and 1383(c)(3)for judicial review of the denial of Plaintiff's applications for Disability Insurance Benefits under Title II of the Social Security Act and Supplemental Security Income under Title XVI of the Act.  The parties consented to the jurisdiction of the undersigned pursuant to 28 U.S.C. § 636(c).

## I.  Procedural History

On March 25, 2008, Plaintiff filed applications for Disability Insurance Benefits ("DIB") and Social Security Income ("SSI").  (Tr. 112-122)  In his applications, Plaintiff alleged disability beginning July 31, 2006 due to depression, schizophrenia, mental impairments, Hepatitis C, and pain in skull, neck, back, and leg. (Tr. 65, 112, 115)  Plaintiff's applications were denied on September 2, 2008, after which Plaintiff requested a hearing before an Administrative Law Judge (ALJ).  (Tr. 41-42, 65-70, 73-74)  On November 4, 2009, Plaintiff appeared and testified at a hearing.  (Tr. 6-28)  In a decision dated March 19, 2009, the ALJ determined that Plaintiff had not been under a disability from July 31, 2006 through the date of the decision.  (Tr. 53-62)  The Appeals Council denied

Plaintiff's Request for Review on April 13, 2011.  (Tr. 1-3)  Thus, the decision of the ALJ stands as the final decision of the Commissioner.

## II.  Evidence Before the ALJ

At the hearing before the ALJ, Plaintiff was represented by counsel.  Upon questioning by the ALJ, Plaintiff testified that he was 44 years old and earned his GED.  He lived in a house with some friends.  Plaintiff last worked in March of 2006 making fiberoptic pipes.  He left that job due to loss of interest after he lost his driver's licence.  His records also indicated that he had no income from 1995 to 1999, which he attributed to "running in the streets."  Plaintiff testified that he could not work due to mental problems or imbalances for which he could not get the right kind of medications. He stated that he had been diagnosed with schizoaffective disorder but insisted he also had hyperactivity, ADD, and major panic and anxiety attacks.  He only slept 2 hours a night.  However, he acknowledged this could be due to consistent drug use.  Plaintiff further stated that he had been clean since May but had not taken any medication for a couple months prior to the hearing.  Plaintiff lost his Medicaid but was in the process of obtaining doctor care.  (Tr. 7-13)

During the day, Plaintiff tried to keep busy.  He paced a lot and had a lot on his mind.  He testified that his Hepatitis was in remission, but he had back and neck problems from prior accidents. Plaintiff also stated that he was at Comtrea the day before and had also gone in October for a drug assessment and to see his therapist.  The ALJ noted that in August 2008 and February 2009, Plaintiff refused to participate in a drug and alcohol evaluation.  However, Plaintiff denied ever missing an assessment and stated his anger toward the facility.  He testified that he tried to get off drugs for years and that, after going through treatment in May, he had maintained his sobriety.  (Tr. 13-15)

Plaintiff further testified that physically he became tired when walking because his medications made him fat and his knees would start hurting. He believed he could walk on a level service for quite awhile. His ability to stand depended on the circumstances. In addition, he had trouble grabbing things because his hands would become painful and lock up. With regard to Plaintiff's mental health issues, he stated that he tried to stay in control and not get angry. When he took medications, they helped him feel more level. Plaintiff stated that his mental problems caused him to get tired, wake up sweating, and become panicky. He tried to get along with everybody. (Tr. 16-19)

Plaintiff's attorney also questioned Plaintiff, who stated that he did not like taking Invega because he was afraid of it. According to Plaintiff, the drug made his panic worse. He testified that the Invega worked for awhile. The only mixture of drugs that controlled his mental problems were illegal drugs. However, he had not taken illicit drugs since leaving the treatment facility. During the day, Plaintiff paced around the kitchen while sweeping the floor and wiping the tables. He testified that he constantly moved around and would sit in a chair when he became tired. However, he could not sit in a chair for very long. Plaintiff had problems sitting in one place and focusing. He experienced crying spells daily when he thought about what he did to himself in the past. The spells lasted about a half hour. (Tr. 19-22)

Brenda Young, a Vocational Expert ("VE"), also testified at the hearing. The ALJ asked the VE to assume a hypothetical individual of Plaintiff's age and education level, with no past relevant work. The individual could perform medium exertional level work with the restriction of only occasionally climbing ropes, ladders, and scaffolds. In addition, the person should avoid concentrated exposure to unprotected heights and hazardous machinery. The individual was also limited to unskilled work. The VE responded that the individual could perform jobs such as handpacker or

packager; laundry worker; and small product assembler. These jobs existed in significant numbers in the regional and national economies. (Tr. 22-24)

In hypothetical two, the ALJ asked the VE to add to the first hypothetical the limitation of no more than occasional contact with the public and coworkers. The VE stated that all of the jobs would remain. For the third hypothetical, the ALJ changed the hypothetical to light work instead of medium. Given this change, the individual could perform assembly jobs, dining room and cafeteria helper positions, and file clerk positions. Finally, if the ALJ added the limitation of occasional, unscheduled disruptions of the work day and work week, secondary to extended periods of decompensation and inability to focus or concentrate for a full day, no jobs would exist in the regional or national economy. (Tr. 24-25)

Plaintiff's attorney asked the VE to assume the same individual described in the ALJ's first three hypothetical questions, with the added limitation that his ability to follow even simple instructions and routines at work would be compromised such that his reliability and work product would be variable and subject to change without notice. Given this limitation, the VE stated that a person who was unreliable in terms of attendance would be unemployable. The ALJ then ended the hearing by leaving the record open for updated records from Comtrea. (Tr. 25-26)

In a Disability Report – Adult, Plaintiff reported that he was 6 feet tall and weighed 280 pounds. His mental impairment, including a history of drug abuse, limited his memory, concentration, and ability to relate to others. Hepatitis C and pain limited his ability to lift, carry, stand, and walk. In addition, Plaintiff stated he was unable to meet the basic mental demands of work activity due to mental problems, including depression and stress. Hepatitis produced fatigue, and his pain limited exertional capacities. Plaintiff stopped working on July 31, 2006 because of his condition. (Tr. 141-

Plaintiff also completed a Missouri Supplemental Questionnaire. He described the symptoms that prevented him from working as lack of concentration, aches, and difficulty getting along with others. Things such as filling out the questionnaire made his symptoms worse. Plaintiff listed several medications that he took for his symptoms and reported that they caused hot sweat, hyperactivity, decreased memory, uncontrollable verbal abuse, and forgetfulness. At the time he completed the form, Plaintiff was homeless and lived with friends and here and there. He was able to do laundry, do dishes, vacuum/sweep, take out trash, perform home repairs, and go to the post office. He shopped one meal at a time and was able to prepare meals. On an average day, Plaintiff paced, had panic attacks, became hyper, cried, and became angry. He could watch TV for 30 minutes but not longer. He had a drivers license but was unable to drive. He reported that his friends and family advised him not to drive due to road rage. Plaintiff further stated he had difficulty following written or verbal instructions because he could not concentrate. (Tr. 158-165)

A friend, Cynthia Sturgess, completed a Function Report Adult – Third Party. She stated that she spent time with Plaintiff watching TV or talking. Plaintiff spent most of his time pacing and worrying about his life. Before becoming disabled, Plaintiff was able to hold a job and do what he needed for his daily life. Ms. Sturgess stated that Plaintiff required reminders to take medication. He was able to prepare meals daily, do his own laundry, and clean the kitchen. At times, he could do chores quickly without problems. Other times, however, he was unable to concentrate or stay on task. When Plaintiff was really depressed, he would not move all day. However, if he felt anxious or nervous, he went in and out of the house several times a day. Plaintiff was able to shop occasionally and not for long periods. Ms. Sturgess reported that Plaintiff's interest was mostly

watching TV. He talked to friends on the phone and occasionally went out with them. He did not participate in many social activities due to his high anxiety levels. Ms. Sturgess opined that Plaintiff's conditions affected stair-climbing, hearing, completing tasks, memory, concentration, and getting along with others. He was able to follow written instructions if he was not upset or uneasy. In addition, if he was able to concentrate, he could follow spoken instructions. He occasionally had problems with authority figures, as he did not like being told what to do. Plaintiff did not handle stress well, and he became angry, upset, loud, and vocal during stressful situations. (Tr. 166-76)

### III.  Medical Evidence

On June 19, 2007, Plaintiff was admitted to Jefferson Memorial Hospital with a diagnosis of diverticulitis. He was discharged the following day with a diagnosis of musculoskeletal and abdominal pain and elevated liver enzymes. (Tr. 233-38)

Plaintiff was again admitted to Jefferson Memorial Hospital from December 20 to 26, 2007. Plaintiff was diagnosed with major depressive disorder, recurrent with psychotic features; polysubstance dependence by history; personality disorder, not otherwise specified; mild exogenous obesity; and a GAF of about 40. His prognosis was guarded. (Tr. 229-32)

From February 5 to February 8, 2008, Plaintiff was hospitalized for major depression. Upon admission, Plaintiff was diagnosed with major depressive disorder, recurrent with psychotic features; polysubstance dependence by history; personality disorder, NOS; mild exogenous obesity; and a GAF of about 20. Plaintiff reported that he had been experiencing an increased degree of depression over the past couple months but had bouts of depression for 15 years. He frequently felt extremely anxious, depressed, and stressed out, and he became easily irritable, agitated, and moody. In addition, Plaintiff stated that he did not drink much alcohol but had been involved in drug abuse starting at age

11. He began using marijuana then moved on to heroin and crystal meth. Plaintiff believed some of his psychiatric difficulties were related to his substance abuse. Although Plaintiff had been married, his wife divorce him because of his drug and alcohol abuse. After treatment with individual psychotherapy, psychotropic medications, and milieu therapy, he was discharged in improved condition. (Tr. 217-24)

After discharge from Jefferson Memorial Hospital, Plaintiff received outpatient treatment from Comtrea Community Treatment, Inc. During a February 15, 2008 initial assessment, Plaintiff's psychomotor activity was overactive and anxious. His mood was anxious, flat, and depressed. He displayed rambling speech and scattered thought process, and he had poor self concept due to environmental situation. Plaintiff reported severe depression issues with crying spells and irritability. He also reported hearing church choir voices. Although he had some suicidal ideation, he stated he would not act on it. Plaintiff was an active IV drug user and used speed about 2 weeks prior. Gina Insalaco, MA, LPC, assessed major depression, recurrent with psychotic features; polysubstance dependence; personality disorder, NOS; mild exogenous obesity; and a GAF of 40. (Tr. 301-04)

On February 18, 2008, Plaintiff was treated at the Des Peres Hospital emergency room for a lacerated right hand after punching and breaking a coffee cup. (Tr. 256) Plaintiff went to St. Anthony's Medical Center on February 23, 2008 complaining that the prior hospital failed to provide antibiotics or pain medication after stitching the laceration. Plaintiff's right hand was infected, and he was given Septra DS and Vicodin. (Tr. 262-65)

Treatment notes from Comtrea dated May 28, 2008, indicated that Plaintiff missed an evaluation on April 3 and was re-referred on May 11. A notation dated June 11, 2008 indicated that Plaintiff was able to get back on medications and had transportation to his appointments. (Tr. 325)

Ronald L. Beach, M.D., evaluated Plaintiff on June 11, 2008. Dr. Beach noted that Plaintiff was a poor historian. Plaintiff reported suicidal ideation and auditory hallucinations. Plaintiff had been in several treatment centers in the past, and his last drink was that morning. He stated that he only drank beer and avoided hard liquor. He also reported using meth, marijuana, heroin, and "pretty much all" in the past. He used amphetamine a couple days before, claiming that it kept him calm. Dr. Beach diagnosed polysubstance dependence; major depressive disorder, recurrent, moderate; rule out schizoaffective disorder; personality disorder NOS; Hepatitis C; and a GAF of 45. Dr. Beach prescribed Seroquel, Celexa, and Trazodone. Dr. Beach noted a pending substance abuse evaluation and advised Plaintiff to discontinue usage while restarting medications. (Tr. 337-39)

An Individual Treatment & Rehabilitation Plan through Comtrea dated June 23, 2008 indicated that Plaintiff would manage symptoms through psychiatric recommendations and need for medication monitoring. To be discharged from continuation of services, his symptoms needed to be in remission for one year, and he needed to remain functioning independently for one year. The obstacle to reaching these goals was a history of depression complicated by substance abuse interfering with daily living. (Tr. 340-41)

Plaintiff met with Roberta Stock, RN, APMHCNS, on August 1, 2008 for 15 minutes. Plaintiff reported being medication compliant. However, he continued to abuse drugs and acknowledged using marijuana daily. He had not used meth in two months, but he took pain pills and purchased morphine on the street. Plaintiff refused to make an appointment for a drug and alcohol evaluation. Nurse Stock assessed schizoaffective disorder; polysubstance abuse and dependence, with continuing use of alcohol, morphine, and marijuana; personality disorder, NOS; Hepatitis C; and a GAF of 45. Nurse Stock increased his medication dosages and advised him to return in one month.

(Tr. 342-43)

On August 20, 2008, Plaintiff underwent a psychiatric consultation. Joseph W. Monolo, a licensed psychologist, reviewed prior records and evaluated Plaintiff. Plaintiff reported being medication compliant, and he stated the medications helped his mood and reduced auditory perceptual disturbances. Plaintiff also reported a history of depression, accompanied by longstanding substance abuse which continued with alcohol consumption and marijuana use once a week. Mr. Monolo noted that Plaintiff's depression could not be clearly separated from his substance use. However, his continued depression in the context of reportedly reduced substance use suggested that Plaintiff's emotional problems were not solely the result of substance use. Plaintiff was able to manage activities of daily living, left home when possible, and assisted with household tasks. In addition, Plaintiff could understand, remember, and follow simple instructions. His concentration and persistence were intact, but his ability to maintain those in a work setting could be compromised by low mood. Mr. Monolo believed, however, that Plaintiff's mood and functioning may continue improving with consistent compliance with treatment and medications and abstinence from substance abuse. Plaintiff was not capable of independently managing finances in light of his substance use. Mr. Monolo assessed major depressive disorder, recurrent, with psychotic features; polysubstance dependence; Hepatitis C; head, neck, and leg pain; and a GAF of 55. (Tr. 308-11)      Plaintiff returned to Nurse Stock on August 29, 2008 for medication management and supportive psychotherapy. Plaintiff reported trying to reduce his drug use. In the prior month, he had only a couple marijuana joints and a couple beers. Nurse Stock noted no depression or irritability. She diagnosed schizoaffective disorder; polysubstance abuse and dependence, with recent use of alcohol and marijuana; personality disorder, NOS; Hepatitis C; and a GAF of 45. Plaintiff declined Nurse Stock's advice to participate in the

alcohol & drug evaluation and programs at Comtrea. (Tr. 344-45)

Judith McGee, Ph.D., completed a Psychiatric Review Technique form on September 2, 2008. She assessed major depressive disorder, recurrent, with psychotic features, and polysubstance abuse. Based on the clinical and subjective findings in the medical record, Dr. McGee found that the impairments did not meet or equal listing level severity, did not appear to cause significant limitations, and were deemed non-severe. (Tr. 312-23)

On November 26, 2008, Dr. Beach evaluated Plaintiff, who had not taken medications over the past couple months. Dr. Beach diagnosed polysubstance dependence; major depressive disorder, recurrent, moderate; rule out schizoaffective disorder; personality disorder, NOS, Hepatitis C; and a GAF of 45. Dr. Beach advised Plaintiff to continue taking medications and return in 6 to 8 weeks. (Tr. 346)

Plaintiff returned to Nurse Stock on January 7, 2009. Plaintiff reported being noncompliant with his medication regimen. He continued to drink alcohol and use drugs such as speed, heroin, and oxycodone. Plaintiff was vague and showed manipulative behavior. Nurse Stock referred him to a hospital for detox, but Plaintiff refused. She assessed schizoaffective disorder; polysubstance dependence continued use; rule out substance induced mood disorder and/or psychosis; antisocial personality disorder; Hepatitis C; and a GAF of 40. She noted that it was difficult to determine any Axis I diagnosis outside of the polysubstance abuse because Plaintiff continued to use. (Tr. 347-48)

On February 4, 2009, Plaintiff had gained weight taking Seroquel. Nurse Stock planned to change his medication to Invega. Plaintiff reported that he was trying to decrease his use of

chemicals. Nurse stock assessed schizoaffective disorder; polysubstance dependence, continues use; rule out substance-induced mood disorder and/or psychosis; antisocial personality disorder; Hepatitis C; and a GAF of 45. (Tr. 349-50)

Comtrea progress notes by his case manager, Lauren Fox, MSE, dated March 20, 2009 indicated that Plaintiff called and stated that he needed counseling. Plaintiff stated that he was not taking his medications because they scared him. The Invega made him pace, and he reported walking 160 miles in his friend's basement over a period of a few days. In addition, Plaintiff reported crying spells and hallucinations. He had recently used methamphetamine. Plaintiff agreed to return after a psychiatric appointment on April 1. (Tr. 334)

Dr. Beach evaluated Plaintiff on April 1, 2009. Plaintiff reported that he was not taking Invega because he was afraid of it. He had not taken Seroquel for over a month. He also admitted to not taking medication over the past month due to lack of funds. Plaintiff admitted depression secondary to financial problems. Dr. Beach diagnosed polysubstance dependence; major depressive disorder, recurrent, moderate; rule out schizoaffective disorder; personality disorder, NOS; Hepatitis C; and a GAF of 45. Dr. Beach adjusted Plaintiff's medications and advised him to return in 6 to 8 weeks. (Tr. 351)

Progress notes from Plaintiff's Comtrea case manager, Ms. Fox, on that same date revealed increased panic attacks and difficulty sleeping. He continued to refuse medication because it freaked him out. (Tr. 336)

Dr. Beach completed a Mental Residual Functional Capacity Questionnaire on April 20, 2009.

Dr. Beach assessed schizoaffective disorder and a GAF of 45, which was treated with medication management. Dr. Beach also noted a history of auditory and visual hallucinations and a chronic problem with anger management. Prognosis was guarded. Plaintiff's signs and symptoms included intermittent thoughts of suicide; blunt, flat, or inappropriate affect; impairment in impulse control; mood disturbance; difficulty thinking or concentrating; perceptual or thinking disturbances; and hallucinations or delusions. Dr. Beach was unable to make a vocational assessment. He opined that Plaintiff's impairment lasted for at least 12 months and that Plaintiff was not a malingerer. (Tr. 366-71)

Plaintiff returned to Nurse Stock on May 13, 2009 for medication management and supportive psychotherapy. He continued to smoke marijuana daily but had not used any other drugs or alcohol for some time. He expressed willingness to undergo an alcohol and drug evaluation. Nurse Stock assessed schizoaffective disorder; polysubstance dependence, continues to use marijuana; ruled out substance-induced mood disorder with psychosis; antisocial personality; Hepatitis C; and GAF of 45. Nurse Stock gave medication samples to Plaintiff. (Tr. 395-96)

On that same date, Plaintiff saw Ms. Fox at Comtrea, who noted a phone call from Plaintiff on April in a state of panic. During the interview, he was upset because he had no word on the status of his disability claim and needed money. He reported having no luck finding work because he refused to work for $10 an hour after previously making $36 and hour. His drug and alcohol assessment was scheduled for May 28. (Tr. 397)

Plaintiff saw Carol Krews, MSW, LCSW, at the Southeast Missouri Community Treatment Center on May 28, 2009. Her diagnosis was polysubstance dependence (marijuana and meth); schizoaffective disorder; and a GAF of 47. (Tr. 385)

Comtrea progress notes dated June 17, 2009 indicated that Plaintiff had been admitted to an inpatient drug and alcohol program. Notes on June 22, 2009 showed Plaintiff would be released from the treatment facility on June 25 to United Mission Gospel, where he had to live for 90 days. According to August 17, 2009 progress notes, after release from treatment, Plaintiff ran from the mission and was in jail for a week. (Tr. 399-402)

Judith Vogelsang, D.O., a medical consultant, completed a Case Analysis and a Physical Residual Functional Capacity form on August 17, 2009. Dr. Vogelsang found Plaintiff's credibility to be partial in light of ongoing use of alcohol and other polysubstances. Plaintiff had Hepatitis C and moderately elevated liver enzymes, which could cause arthritic pain and fatigue. Other medically determinable impairments included moderate obesity and hypertension, not under optimal control. Dr. Vogelsang opined that Plaintiff could lift 20 pounds occasionally and 10 pounds frequently; stand and/or walk 6 hours in an 8-hour workday; sit about 6 hours in an 8-hour work day; and push and/or pull in an unlimited manner. He could occasionally climb ramps and stairs, stoop, crouch, and crawl; however, he could never climb ladders, ropes, or scaffolds. He should avoid concentrated exposure to extreme cold and noise, and he should avoid even moderate exposure to hazards. (Tr. 373-80)

On September 24, 2009, Plaintiff called Ms. Fox to inform her he did not attend his last psychiatric appointment because of Medicaid ineligibility. He had not been on his medication for awhile. On October 13, 2009, Plaintiff saw Ms. Fox prior to an assessment with Dale Dehnam. Plaintiff reported panic attacks. He was out of medication and started smoking. (Tr. 404-05)

Consultation notes dated October 13, 2009 revealed a history of heavy drug and alcohol use.

He last drank alcohol 3 weeks before and last smoked marijuana a week ago. Meth had been his drug of choice throughout the years. He used meth on a regular basis through May 2009. (Tr. 406)

On October 15, 2009, Ms. Fox completed a Comtrea Brief/Annual Evaluation. Plaintiff reported feeling on edge and panicky, experiencing difficulty sleeping, and hearing voices. His judgment, memory, self-concept, and insight were questionable. Plaintiff recently enrolled in classes at Jefferson College for heating and cooling repair. Ms. Fox assessed schizoaffective disorder; antisocial personality disorder; and a GAF of 40. (Tr. 421-23)

Jhansi Vasireddy, M.D., performed a psychiatric evaluation on November 10, 2009. Plaintiff's chief complaint was to see a psychiatrist for medications. Plaintiff had not been taking any medication. He last used marijuana two weeks before. Plaintiff smoked a pack of cigarettes a day. He last drank alcohol in May 2009. He had used most drugs, but meth was his drug of choice because it calmed him. Dr. Vasireddy diagnosed schizoaffective disorder; polysubstance dependence; personality disorder, NOS, with antisocial personality traits; Hepatitis C; arthritis; and a GAF of 45 to 50. Dr. Vasireddy ordered laboratory work and started medications. (Tr. 425-27)

Progress notes from Ms. Fox dated January 28, 2010 indicated that Plaintiff missed several appointments and had no scheduled appointment with the physician. Ms. Fox finally reached Plaintiff by phone and reminded him to attend physician appointments and remain compliant with medications. (Tr. 434)

Plaintiff met with Dr. Vasireddy on February 2, 2010 for medication management. Plaintiff stopped taking Abilify and complained of decreased sleep and anxiety. Dr. Vasireddy assessed schizoaffective disorder; polysubstance dependence; personality disorder, NOS, with antisocial personality traits; Hepatitis C; arthritis; and a GAF of 50 to 55. Plaintiff was not taking medications

but wanted to go back to Seroquel. Dr. Vasireddy recommended alternative therapy such as individual therapy and healthy lifestyle such as diet and exercise. (Tr. 435-36)

### IV.  The ALJ's Determination

In a decision dated March 19, 2010, the ALJ determined that the Plaintiff met the insured status requirements of the Social Security Act through September 30, 2010. He had not engaged in substantial gainful activity since July 31, 2006, the alleged onset date. The ALJ found that Plaintiff had severe impairments including schizoaffective disorder; depression; substance abuse; and obesity. Plaintiff had not received treatment for Hepatitis C or elevated liver enzymes, and the ALJ found these conditions non-severe. The ALJ also found Plaintiff did not have an impairment or combination thereof that met or medically equaled one of the listed impairments in 20 C.F.R. Part 404, Subpart P, Appendix 1. (Tr. 53-56)

After considering the record, the ALJ determined that Plaintiff had the residual functional capacity ("RFC") to perform medium work as defined in 20 C.F.R. §§ 404.1567(c) and 416.967(c). Plaintiff retained the ability to lift and/or carry 50 pounds occasionally and 25 pounds frequently; stand and/or walk for 6 out of 8 hours; and sit for 6 out of 8 hours. He was limited to no more than occasional climbing of ropes, ladders, or scaffolds. In addition, he needed to avoid concentrated exposure to hazards of unprotected heights. He was further limited to unskilled work requiring no more than occasional contact with the general public or coworkers. The ALJ assessed Plaintiff's allegations and the medical testimony, noting that Plaintiff's continued refusal to attend drug and alcohol evaluations and to cease using drugs and alcohol significantly impacted his credibility. (Tr. 57- 60)

In addition, the ALJ found that Plaintiff had no past relevant work. At the time of the hearing,

15

Plaintiff was a younger individual with at least a high school education. In light of Plaintiff's age, work experience, and RFC, the ALJ relied on VE testimony to determine that a significant number of jobs existed in the national economy which Plaintiff could perform, including hand packer, laundry worker, and small product assembler. The ALJ thus concluded that Plaintiff had not been under a disability from July 31, 2006 through the date of the decision. (Tr. 60-62)

## V. Legal Standards

A claimant for social security disability benefits must demonstrate that he or she suffers from a physical or mental disability. 42 U.S.C. § 423(a)(1). The Social Security Act defines disability as "the inability to do any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period not less than 12 months." 20 C.F.R. § 404.1505(a).

To determine whether a claimant is disabled, the Commissioner engages in a five step evaluation process. See 20 C.F.R. § 404.1520(b)-(f). Those steps require a claimant to show: (1) that claimant is not engaged in substantial gainful activity; (2) that he has a severe impairment or combination of impairments which significantly limits his physical or mental ability to do basic work activities; or (3) he has an impairment which meets or exceeds one of the impairments listed in 20 C.F.R., Subpart P, Appendix 1; (4) he is unable to return to his past relevant work; and (5) his impairments prevent him from doing any other work. Id.

The Court must affirm the decision of the ALJ if it is supported by substantial evidence. 42 U.S.C. § 405(g). "Substantial evidence 'is less than a preponderance, but enough so that a reasonable mind might find it adequate to support the conclusion.'" Cruse v. Chater, 85 F.3d 1320, 1323 (8th Cir. 1996) (quoting Oberst v. Shalala, 2 F.3d 249, 250 (8th Cir. 1993)). The Court does not re-weigh

the evidence or review the record *de novo*.  Id. at 1328 (citing Robert v. Sullivan, 956 F.2d 836, 838 (8th Cir. 1992)).  Instead, even if it is possible to draw two different conclusions from the evidence, the Court must affirm the Commissioner's decision if it is supported by substantial evidence.  Id. at 1320; Clark v. Chater, 75 F.3d 414, 416-17 (8th Cir. 1996).

To determine whether the Commissioner's final decision is supported by substantial evidence, the Court must review the administrative record as a whole and consider: (1) the credibility findings made by the ALJ; (2) the plaintiff's vocational factors; (3) the medical evidence from treating and consulting physicians; (4) the plaintiff's subjective complaints regarding exertional and non-exertional activities and impairments; (5) any corroboration by third parties of the plaintiff's impairments; and (6) the testimony of vocational experts when required which is based upon a proper hypothetical question that sets forth the plaintiff's impairment(s).  Stewart v. Secretary of Health & Human Servs., 957 F.2d 581, 585-86 (8th Cir. 1992); Brand v. Secretary of Health Educ. & Welfare, 623 F.2d 523, 527 (8th Cir. 1980).

The ALJ may discount a plaintiff's subjective complaints if they are inconsistent with the evidence as a whole, but the law requires the ALJ to make express credibility determinations and set forth the inconsistencies in the record.  Marciniak v. Shalala, 49 F.3d 1350, 1354 (8th Cir. 1995). It is not enough that the record contain inconsistencies; the ALJ must specifically demonstrate that she considered all the evidence.  Id. at 1354; Ricketts v. Secretary of Health & Human Servs., 902 F.2d 661, 664 (8th Cir. 1990).

When a plaintiff claims that the ALJ failed to properly consider subjective complaints, the duty of the Court is to ascertain whether the ALJ considered all of the evidence relevant to plaintiff's

complaints under the <u>Polaski</u>[1] standards and whether the evidence so contradicts plaintiff's subjective complaints that the ALJ could discount his testimony as not credible. <u>Benskin v. Bowen</u>, 830 F.2d 878, 882 (8th Cir. 1987). If inconsistencies in the record and a lack of supporting medical evidence support the ALJ's decision, the Court will not reverse the decision simply because some evidence may support the opposite conclusion. <u>Marciniak</u>, 49 F.3d at 1354.

## VI.  Discussion

Plaintiff raises two arguments in his Brief in Support of the Complaint. Plaintiff asserts that the ALJ failed to support his RFC finding with some medical evidence. Plaintiff also contends that the hypothetical question posed to the VE did not accurately describe Plaintiff's impairments such that substantial evidence did not support the ALJ's decision. The Defendant maintains that the record supports the ALJ's RFC finding and that the ALJ properly relied on the VE's testimony. The undersigned finds that substantial evidence supports the ALJ's determination.

### A.  The RFC Determination

Residual Functional Capacity (RFC) is a medical question, and the ALJ's assessment must be supported by substantial evidence. <u>Hutsell v. Massanari</u>, 259 F.3d 707, 711 (8th Cir. 2001) (citations omitted). RFC is defined as the most that a claimant can still do in a work setting despite that claimant's limitations. 20 C.F.R. § 416.945(a)(1). With regard to RFC, "a disability claimant has the burden to establish her RFC." <u>Eichelberger v. Barnhart</u>, 390 F.3d 584, 591 (8th Cir. 2004) (citation omitted). The ALJ determines a claimant's RFC "'based on all the relevant evidence, including

---

[1] The <u>Polaski</u> factors include: (1) the objective medical evidence; (2) the subjective evidence of pain; (3) any precipitating or aggravating factors; (4) the claimant's daily activities; (5) the effects of any medication; and (6) the claimants functional restrictions. <u>Polaski v. Heckler</u>, 739 F.2d 1320, 1322 (8th Cir. 1984).

medical records, observations of treating physicians and others, and [claimant's] own description of her limitations.'" Page v. Astrue, 484 F.3d 1040, 1043 (8th Cir. 2007) (quoting Anderson v. Shalala, 51 F.3d 777, 779 (8th Cir. 1995)).

Here, the ALJ first noted Plaintiff's treatment history, which was inconsistent and somewhat sporadic. In addition, Plaintiff did not follow prescribed treatment, most notably the orders to cease using illegal drugs. (Tr. 58-59) Failure to comply with recommended treatment may be a basis for discrediting a plaintiff. Eichelberger v. Barnhart, 390 F.3d 584, 590 (8th Cir. 2005) (citation omitted) While Plaintiff asserts that his lack of compliance was due to lack of finances, the record shows that he was able to support his drug and alcohol habit throughout this time period. The ALJ may consider inconsistencies between Plaintiff's allegation of inability to afford medication and ability to pay for drugs when determining Plaintiff's credibility. Theis v. Astrue, No. 4:11CV799 MLM, 2012 WL 2282501, at *9 (E.D. Mo. June 18, 2012). Further, the record demonstrates that Plaintiff was motivated to obtain disability benefits and not to work. Indeed, he told his case manager that he wasn't going to work for $10 an hour when he used to make $36 an hour. (Tr. 397) A strong element of secondary gain "belies [Plaintiff's] sincere belief that he is truly disabled and unable to perform any substantial gainful activity." Gaddis v. Chater, 76 F.3d 893, 896 (8th Cir. 1996).

With regard to the medical evidence, the record shows that the ALJ properly considered the medical records and based the RFC determination on that evidence. The ALJ explicitly agreed with Joseph Monolo's findings that Plaintiff could maintain social interaction; could understand, remember, and follow simple instructions; and had intact concentration, persistence, and pace. Mr. Monolo, a licensed psychologist, also noted that Plaintiff's condition would improve with consistent treatment and abstinence from substance abuse. (Tr. 59) Although Mr. Monolo was not a treating source, the

ALJ found that, as an examining specialist, his opinion was consistent with the overall evidence in the record and was supported by a narrative explanation. (Tr. 59)

Plaintiff argues, however, that the ALJ erred in failing to give greater weight to Plaintiff's treating mental health providers, specifically Dr. Beach and Dr. Vasireddy. "A treating physician's opinion should not ordinarily be disregarded and is entitled to substantial weight . . . provided the opinion is well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence in the record." Singh v. Apfel, 222 F.3d 448, 452 (8th Cir. 2000) (citations omitted). However, "an ALJ may discount such an opinion if other medical assessments are supported by superior medical evidence, or if the treating physician has offered inconsistent opinions." Holstrom v. Massanari, 270 F.3d 715, 720 (8th Cir. 2001) (citation omitted). Further, "[i]t is appropriate to give little weight to statements of opinion by a treating physician that consist of nothing more than vague, conclusory statements." Swarnes v. Astrue, Civ. No. 08-5025-KES, 2009 WL 454930, at *11 (D.S.D. Feb. 23, 2009) (citation omitted). "An ALJ may accord greater weight to a consulting physician only where the one-time medical assessment is supported by better or more thorough evidence or where a treating physician renders inconsistent opinions." Turner v. Astrue, No. 4:08-CV-107 CAS, 2009 WL 512785, at *11 (E.D. Mo. Feb. 27, 2009) (citation omitted).

Here, the record shows that, although Drs. Beach and Vasireddy diagnosed major depressive disorder and/or schizoaffective disorder, both doctors also diagnosed polysubstance dependence and advised Plaintiff to stop using drugs and alcohol and maintain a healthy lifestyle. (Tr. 339, 436) Further, nothing in these 15 minute evaluations addressed Plaintiff's ability to work. However, Mr. Monolo's thorough assessment and mental status evaluation demonstrates that Plaintiff is able to

function in a work setting, with a limitation to simple instructions. (Tr. 311) Mr. Monolo noted that Plaintiff's ability to maintain concentration and persistence in a work setting could be compromised by his low mood. However, Mr. Monolo also agreed with Plaintiff's other doctors that consistent medication compliance and abstinence from substance use could improve Plaintiff's mood and functioning. (Tr. 311)

The undersigned finds that Mr. Monolo's opinion is consistent with the medical records and supported by a more thorough explanation, entitling it to significant weight.[2] Turner, 2009 WL 512785, at *11. The ALJ found that Plaintiff could perform unskilled work, which "include the abilities (on a sustained basis) to understand, carry out, and remember simple instructions; to respond appropriately to supervision, coworkers, and usual work situations; and to deal with changes in a routine work setting." Social Security Ruling (SSR) 85-15. This finding is consistent with Mr. Molono's opinion and with the medical records. Plaintiff has failed to meet his burden of showing that his RFC is more limited than that found by the ALJ. Instead, as stated by the Defendant, Plaintiff's noncompliance with medical treatment and failure to abstain from substance abuse indicates a person "voluntarily engaging in self-destructive behavior, not one who is truly disabled." (Brief in Support of the Answer 11, ECF No. 19) "If the claimant in this case chooses to drive himself to an early grave, that is his privilege – but if he is not truly disabled, he has no right to require those who pay social security taxes to help underwrite the cost of his ride." Sias v. Sec'y of Health and Human

---

[2] Plaintiff relies heavily on Plaintiff's low GAF scores, which indicated significant impairment in making social, occupational, and educational adjustment. However, Defendant correctly point out that "[w]hile a GAF score may be of considerable help to the ALJ in formulating the RFC, it is not essential to the RFC's accuracy." Howard v. Commissioner of Soc. Sec., 276 F.3d 235, 241 (6th Cir. 2002). "Thus, the ALJ's failure to reference the GAF score in the RFC, standing alone, does not make the RFC inaccurate." Id.

Servs., 861 F2d 475, 480 (6th Cir. 1988). Thus, the Court finds that substantial evidence supports the ALJ's RFC determination.

## B. Hypothetical Question to the VE

Plaintiff next argues that the hypothetical question posed to the VE failed to include all of Plaintiff's limitations, and, therefore, the VE's response did not constitute substantial evidence. The Defendant responds that hypothetical question properly included only those impairments and restrictions that the ALJ found credible.

The undersigned agrees that the ALJ posed a proper hypothetical question to the VE and that the VE's testimony that Plaintiff could perform work was substantial evidence in support of the ALJ's determination. "A hypothetical question is properly formulated if it sets forth impairments 'supported by substantial evidence in the record and accepted as true by the ALJ.'" Guilliams v. Barnhart, 393 F.3d 798, 804 (8th Cir. 2005) (quoting Davis v. Apfel, 239 F.3d 962, 966 (8th Cir. 2001)). Further, where substantial evidence supports an ALJ's finding that a plaintiff's complaints were not credible, the ALJ may properly exclude those complaints from the hypothetical question. Id.

In the instant case, the ALJ included only those impairments and limitations that he found credible. The ALJ asked the VE to assume an individual with Plaintiff's age, education, and no past work experience, who could work at a medium exertional level. (Tr. 23-24) The ALJ also included those credible physical and mental limitations, such as performing only unskilled work; occasionally climbing ropes, ladders, and scaffolds, avoiding concentrated exposure at unprotected heights and hazardous machinery; and having no more than occasional contact with coworkers and the public. (Tr. 23-24) These limitations are consistent with medical and other evidence in the record and with the ALJ's RFC determination.

Therefore, the undersigned finds that "[t]he hypothetical was sufficient because it represented a valid assessment of [Plaintiff's] . . . limitations consistent with the evidence in the record." <u>Davis v. Apfel</u>, 239 F.3d 962, 966 (8th Cir. 2001). Because the hypothetical question properly set forth Plaintiff's limitations, the VE's testimony constituted substantial evidence upon which the ALJ could properly rely in determining that Plaintiff was not disabled. <u>Id.</u>

Accordingly,

**IT IS HEREBY ORDERED** that the final decision of the Commissioner denying social security benefits be **AFFIRMED**. A separate Judgment in accordance with this Memorandum and Order is entered this same date.


<u>/s/ Terry I. Adelman</u>
UNITED STATES MAGISTRATE JUDGE

Dated this <u>28th</u> day of September, 2012.